## Sarah Perret and Eliza Perret, Appellants, v. Henry Perret.

[Marked to be reported.]

*Will—Decedents' estates—Issue devisavit vel non—Undue influence—Evidence—Province of court and jury.*

On the trial of an issue devisavit vel non in which the alleged will is attacked on the ground of undue influence, the case is for the jury where the evidence on behalf of the contestant, although contradicted, tends to show that the wife of the testator, after a quarrel with the contestant who was her only son, declared that she would have his father cut him off without a cent; and it was further shown that she possessed great influence over her husband, who feared to resist her; that she immediately sent for a lawyer, and had a will prepared disinheriting the contestant; that she told her husband who was ill and weak at the time, and died of senility five days thereafter, that if he did not sign the will she would put him

out of the house; that she remained with her husband until it had been executed; that testator had always been on good terms with his son, and had expressed his intention to divide his property equally between the son who had been very kind to him, and his daughter.

*Evidence—Declarations—Issue devisavit vel non—Undue influence.*

On the trial of an issue devisavit vel non where undue influence by testator's wife is alleged by a son, declarations of the wife, made a few hours before the will which made her the principal beneficiary and disinherited the son was drawn and executed, to the effect that she would have her husband cut off the contestant, his only son, without a cent, are admissible.

Argued Nov. 1, 1897. Appeal, No. 101, Oct. T., 1897, by plaintiffs, from judgment of C. P. No. 1, Allegheny Co., June Term, 1896, No. 769, on verdict for defendant. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Issue devisavit vel non. Before STOWE, P. J.

The facts appear by the opinion of the Supreme Court.

At the trial defendant offered to prove by the witness on the stand that he was present in the courthouse a short time before the death of Michael Perret; that Mrs. Sarah Perret and Eliza Perret were present, and that, in the presence of the witnesses, Sarah Perret said to Henry Perret, " Never mind, Henry, I will cut you off to-night without a cent," or words to that effect; this evidence to be followed by testimony showing that it was the same day that the will was made, and that in pursuance of this threat Mrs. Perret immediately sent a man by the name of Hans Liebrich to her lawyer and ordered him to come to their house that night and make Michael Perret's will. She then went home and threatened Mr. Michael Perret, the testator, that if he did not make the will she would turn him out, and that that night the witness summoned by her and the lawyer summoned by her appeared and made the will; that four days after the making of the will Michael Perret died by reason of senility or old age.

Counsel for plaintiffs objected to the witness testifying to any declaration of Sarah Perret, the devisee, under this will, as incompetent and irrelevant, as the interest of Sarah and Eliza are several interests and not joint, and the declarations of the one are not admissible to affect the interests of the other.

By the Court: The objections are overruled and bill sealed for the plaintiffs.

" Q. State what you heard Mrs. Sarah Perret say to Henry Perret on that day in the sheriff's office, if she said anything to him.   A. I noticed her calling Henry a lot of words; she shook her finger at him and said, 'Never mind, Henry, I will cut you off this very night without a cent;' that is all I heard." [12]

The court charged in part as follows:

[If a man had a sufficiency, and merely a sufficiency for his wife to live upon, and she was up in years and had children able to take care of themselves, and he had confidence in his wife doing that for his children which he would be disposed to do, leaving enough in case of his death to support her and yet not enough when divided to support the children, nothing fairer in the world would be than for a man to give his property to his wife for her life and then submit the fate of the children to the mother.] [6] . . . . I can cut off my child and give my property to charity, or I can give it to a stranger, and the law would not allow the will to be set aside because it may be manifestly unjust, unless there is something to indicate that some influence had been brought to bear that put into that will the will of some other person instead of my own actual purpose. That being the case, a man may cut off one child and give all his property to one child and none to another; or he may divide it as he sees fit. [And yet when a will of that kind is made, where it seems to bear unfairly, where one is cut off without some sufficient or apparent cause, and the estate all given to the other, and a contest arises in court where there is evidence tending to show that some undue influence has been brought to bear, that very fact, although by no means conclusive, is a proper subject under proper testimony as indicating whether or not the will does carry out the purpose of the testator or whether some other will has been injected into it which controlled him in making the will the way he did.] [7]   Ordinarily the children stand together upon an equal footing, and should be treated alike.   Our nature, the very law under our intestate law devises things equally, and if a will is made that would bear harshly upon one and seem to give to one that which that one ought not to have, and take from the other that which he ought to have, where the

evidence tends to show undue influence and the circumstances indicate somebody has actually interfered to make the will that way, it is a matter for the consideration of the jury whether or not undue influence was actually brought to bear. But if the evidence does not satisfy the jury of that, then, however unjust the will may be, however unfair, however inhuman it may be, neither courts nor juries have a right to interfere with a man's right to make a will.

We have been asked by counsel for defendant to say:

1. "That where a testator, although possessed of testamentary capacity, is aged, infirm, with mental faculties impaired, if a confidential adviser be largely beneficiary under the will, there is a presumption of fact that undue influence was brought to bear on the mind of the testator, and the burden is on the proponent to rebut the presumption." That is a correct statement of the law. Where a man has a confidential adviser, and that party is acting in a confidential way, and apparently controlling a man by acting with him in making a will, and that party is a beneficiary under the will, the law looks upon that with very great suspicion, so much suspicion that the presumption is that really the will was made by the influence of that party. But that is a doctrine that has to be applied very carefully. [A wife is not necessarily a confidential adviser, nor is a child, but if that person, whether wife or child, has control over the business, and getting control of the mind of the testator in that way, exercises and uses that control for the purpose of securing for themselves a benefit under the will it is presumptively an act done under undue influence, not necessarily so, merely presumptively.] [8] [If it appears that the wife or child stood in a relation to fairly rebut that presumption by showing that she was entitled to be a beneficiary under the will, then the mere fact that she did influence in a general way the testator in making the will should have very little, if any, influence in the consideration of the jury.] [4]

2. "If the will of a man in the physical and mental condition of the testator mentioned in the first point gives his wife all of his estate, the presumption is that it was the result of undue influence, and she must satisfy the jury by the evidence that it was the free, unconstrained exercise of the mind to make the testament." This is refused. That simply amounts to this in

its broadest sense; that if a man had a warm affection for his wife, stood in that relation to her that every married man would like to stand in relation to his wife, he having her confidence and she having his, if she influenced him, or if he simply made a will in her favor, although apparently in her absence, then the presumption of law is that she used undue influence. In other words, that the mere fact that she was his wife and bore a confidential relation to him without proof upon the subject at all, except the mere proof of the legal execution of the will, would justify the jury in giving a verdict that would condemn the will upon the ground that the wife exercised undue influence. That is not the law, and I hope never will be. I will read, in this connection, from this text book, which I may say is a summary of decisions made in various places upon questions of this kind. " The wife has been treated with a marked indulgence in testamentary cases which involve issues of this kind; out of consideration, as it would appear, to her sex and marital position, which incline her to persuasive, tender and persistent, rather than overruling, methods of influence, and to the impression which popularly obtains, moreover, that a true and faithful spouse is not likely to gain more under her husband's will than she really deserves. Hence, a wife's pleading, and even her importunity with her husband, seldom avoids a will made under its influence, so long as it may be supposed that the husband weighed what she proposed, and deliberated for himself, and that she practiced no deception upon him; and generally speaking a wife may justly influence the making of her husband's will for her own benefit or that of others, so long as she does not act fraudulently, or extort benefits from her husband when he is not in condition to exercise his faculties as a free agent."

So that the mere fact that the wife conducted, if she did conduct, to a very large extent, the business for old Mr. Perret; the mere fact that she attended very much to his business, and, if it is true, had very affectionate and confidential relations with him, will not of itself justify this jury or any jury in finding that the will was executed under undue influence. [But when you come to the consideration of the facts established in the evidence — I say established, but that is a matter for you,] [9] you will consider any evidence in the case which tends to show, as alleged by the defendant, that the old lady

determined, and declared her determination, to have the son cut out of this will; that she would make the old gentlemen make a will taking property from him that he otherwise would inherit, and did those acts which would satisfy the jury that there was a fixed determination in her mind to secure that end, and, shortly afterwards, this will was made under such circumstances as would indicate fairly to the jury that she exercised that which she said she would exercise, if she had the power to do so, and secured by the exercise of that influence over the old gentleman the will to be made in the manner in which it was, cutting him out. Then, notwithstanding the fact that they may have had the kindest feeling toward each other, if those facts existed, and under that influence of hers she induced the old gentleman unfairly to make the will cutting out the son, it is a case where the doctrine would apply, and the jury would be justified, if they are satisfied of that fact, in setting aside this will and finding a verdict for the defendant.

3. "The exhibits 'A' and 'B,' purporting to be wills of Michael Perret, although believed to be genuine, are only evidence which may shed light upon the questions which arise upon the issue to test the validity of the alleged will of February 11, 1896." That means this : There were two wills offered in evidence, made several years before the last will now before us. We have nothing to do with, nor can we test in this case the validity of, those wills further than to know that they tend to show that the old gentleman, in making the will as he did— if they do tend to show that fact—was not influenced by the wife, but that it was an old consistent and determined idea of his to make a disposition of his property in that way. [Whether these wills are valid or not is a matter to be considered hereafter, but so far as they bear upon this case, the only effect is to tend to rebut the presumption that the testator made this will under the influence of his wife exerting.] [5, 11]

[Even the best of men with very few exceptions, when they get up in life approaching eighty years of age are not the men they were at forty-five or fifty. There are some exceptions, but very few. Therefore, the jury will take the evidence in this case tending to show that this old man was ailing, had not been physically well, in the proper sense of the term, not actually sick in the sense of being laid up in bed with some particular

disease, but gradually breaking down, probably troubled with diarrhœa for a long time, which would have a tendency to weaken his condition, and sitting around with his mind partially, not exactly destroyed, but with his faculties, his quickness and strength more or less affected by the influence that time and perhaps disease had upon him.] [10]

Plaintiff's points and the answers thereto were as follows:

1. The court is respectfully asked to charge the jury that there is no evidence in the case that would justify the jury in finding that Michael Perret at the date of the execution of the will, to wit: February 11, 1896, was not of sound mind, memory and understanding, and the verdict under the first point of the declaration should be for the plaintiffs. *Answer:* Refused. There is no evidence to justify the jury in finding Michael Perret was of unsound mind, nor is there any evidence that would justify them in finding that the will was not properly executed, so far as the evidence bearing upon the execution of the will is concerned. But when the point suggests that the jury be instructed by the court how they should find, the point is refused. It is for you to say whether you are satisfied from the testimony that there was undue influence, and whether that influence was such as induced the old gentleman to make his will different from what he otherwise would have made it. If so, then it is your duty to find a verdict for the defendant. If the evidence does not satisfy you of that fact, if you are not satisfied from the fair weight of the testimony that undue influence was brought to bear upon old Michael Perret to make this will, then you have to follow the natural and regular presumption of law in cases of this kind and find a verdict for the plaintiffs. [1]

2. The court is requested to charge the jury that the evidence in this case is conclusive that said will was executed in due form by said Michael Perret when possessed of testamentary capacity, and that the presumption of law is that when the maker of a will possessed of mental power sufficient to make a will does execute a will in due form, that he does so without undue influence; that the burden of proof is then on those who allege that the will was executed under undue influence, and that no sufficient evidence has been adduced in this case to warrant the jury in finding the issue of undue influence in favor of the defendants, and that their verdict should be for the plaintiffs. *An-*

swer: Refused. The first part of that is correct, but when we come to that part of it which says that the jury must find a verdict for the plaintiffs, the point is refused. It is for the jury to say whether or not there is sufficient evidence for them to determine that fact, and not a matter for the court. [2]

3. Under all the evidence in this case the verdict must be for the plaintiffs. *Answer:* Refused. [3]

Verdict and judgment for defendant. Plaintiffs·appealed.

*Errors assigned* were (1–11) above instructions, quoting them; (12) rulings on evidence, quoting the bill of exceptions.

· *L. K. Porter* and *S. G. Porter*, with them *John N. Dunn*, for appellants.—The burden of proving undue influence is upon those who allege it: Hardy's Appeal, 12 Phila. 22; Hoshauer v. Hoshauer, 26 Pa. 404; McMahon v. Ryan, 20 Pa. 329; Herster v. Herster, 122 Pa. 239; Zimmerman v. Zimmerman, 23 Pa. 275.

Declarations made before its execution by parties who afterwards become legatees under a will are not admissible against the validity of the will: Hauberger v. Root, 6 W. & S. 431; Schouler on Wills, 196; Clark v. Morrison, 25 Pa. 453; Shaver v. McCarthy, 110 Pa. 339; Crocker v. Chase, 1 East. Rep's 741; Ames's Will, 51 Iowa 796; Thompson v. Thompson, 13 Ohio, 356; Hoshauer v. Hoshauer, 26 Pa. 404.

The great age of a testator, instead of being selected as a point of attack on his will, should be regarded as one of its safeguards: Napfle's Est., 134 Pa. 492.

*Rody P. Marshall*, with him *Thomas M. Marshall*, for appellee, cited Miller's Est., 179 Pa. 645.

OPINION BY MR. JUSTICE GREEN, January 3, 1898:

This proceeding was an issue certified from the register of wills of Allegheny county to the court of common pleas No. 1, to try the question of undue influence exerted upon the testator, Michael Perret, by his wife and daughter, in the making of his last will. The plaintiffs are the widow and daughter of the testator, and the defendant is his only son. The will in question was executed on the 11th day of February, 1896, and the

testator died on the 17th day of the same month. The precept included a charge of mental unsoundness, but on the trial that issue was practically abandoned, and the case was tried before the jury on the question of undue influence. By the terms of the will the whole estate of the testator was given to his widow absolutely, and in case she died before the testator it was all given to the daughter absolutely. Nothing was given in any event to the son. There were but two children, the daughter and the son. In no event could any part of the estate come to the son. The verdict of the jury was in favor of the defendant, and therefore against the will. The important assignments of error are to the refusal of the court to give binding instructions to the jury in favor of the plaintiffs, and the practical question in this Court, therefore, is, was there sufficient evidence of undue influence to submit the question to the jury? If there was, the court below was not in error in refusing these requests. In order to determine the propriety of these assignments, therefore, it will be necessary to recur to the testimony in some detail.

It was fully proved on the trial, and not at all denied, that the defendant lived with his father and mother until he was over forty years of age; that during all the time after he was old enough to work he worked incessantly and continuously for his parents, who conducted the business of market gardening on the property of the father, which consisted of a small tract of land containing about seven acres, and was situated on California avenue in the city of Allegheny. It was also testified by himself that he received no wages during all that time, and had nothing but his board and clothing for his service. Some two or three years before his father's death he married and brought his wife home to live with him. It was proved without contradiction that his mother and sister disliked his wife greatly, and there was a continued state of wrangling and quarreling on that account, which culminated, according to the defendant's testimony, in his being put off the premises with his wife. Things came to such a pass between the defendant and his mother that cross prosecutions for assault and battery resulted, and the cases were heard in the criminal court, and resulted in sentences that each party should pay costs. On the day that this occurred the mother and son met in the sheriff's office for the purpose of pay-

ing the costs, and at this point the testimony commences with proof of the declarations and acts of the mother, which it is claimed resulted in the alleged undue influence which procured the execution of the will in question. Hans Leibrich who lived in part of the house occupied by Michael Perret was at the trial and in the sheriff's office, and out in the hall of the building. He was asked, "What did Sarah Perret say to Henry, if anything, in the hall, after the case was tried? A. She came out to Henry at the side of the elevator and she says, 'Henry, what have you done? You have sworn falsely, and you shall see this evening. Your father have to make a will and have to cut you out without a cent. I fix you everything. I fix you.'" This occurred on February 11, the day the will was made. The witness having stated that they then went down to the sheriff's office, was asked, "What did Mrs. Perret say to Henry down there? A. She repeated about the same; she went up to him and says, 'I fix you now, you swore false; you shall have not one cent; I go home to your father and he shall fix you out. I fix you.' Q. Even after Henry left did she keep muttering down there? A. Yes, sir, all the time she was angry about the whole thing. Q. What did she tell you to do that day immediately after or during the time you were in the sheriff's office? A. She sent me to lawyer Dunn. I shall go to Dunn to tell him that he shall come up and make a will for Mike. Michael Perret shall make a will and he shall come as notary public, and I went to Dunn." The witness then said he went to Dunn's office and delivered his message, and then he and his wife rode in the street car going home, and on the car Mrs. Perret again said, "Now I will fix that Henry; he makes me that trouble and swears false. I fix him for that; he will be cut out without a cent. . . . Q. That was the burden of her conversation? A. Yes, sir, that was all the conversation—fix Henry now, and she got the control of her husband and she wants to fix him now, he will be cut out without a cent." After they reached the house, he said the old man was there sitting by the fire and lying on the lounge, and he was "dead sick," and died five days after. He was asked, "Did she say anything to her husband when she went into the room? A. Yes sir, she told him all about it, that Henry was false swearing. She told him, and Eliza was in there, and they have control of the old man and

say, 'Dunn is coming here, Dunn is a notary public and makes the will or bring a will and you have to shut Henry out without a cent, not to give him a cent or we shut you out of the house.' . . . Q. What reply did Michael Perret make to the folks, Eliza Perret and Sarah Perret, when they told him unless he made a will they would put him out? A. He says, 'Never mind ; take all of it; you haven't got enough. You want all!' . . . . Q. What did Miss Eliza Perret say to her father, if anything, when they arrived home, and in the presence of Sarah Perret? A. They are both talking together, one time Eliza talks and another time old Mrs. Perret talks and says have to cut Henry out; he swears false and he is against his mother; you have to cut him out. Q. What else did they say? A. They say lawyer Dunn comes out this evening at 8 o'clock and witnesses come here, and you have to make that will to shut Henry out without a cent."

Mrs. Perret denied all this conversation, and she also denied all the other conversations to a similar effect testified to by other witnesses, and Mr. Dunn said he came because he was notified by Charles Hartman, and not by Leibrich. This raised a question of credibility which, of course, was for the jury. As to the declarations made by Mrs. Perret, there was a large amount of additional testimony, some of which was as follows : Mrs. Katie Leibrich, the wife of the last witness, said she was out in the hall of the courthouse on the day of the trial. She was asked, " Q. What, if any threats did Mrs. Perret make to Henry out in the hall? A. Yes, sir; she said to him, 'Just wait Henry. I will fix you, because you swore falsely.' Q. Did she say when she would fix him? A. That night. Q. What did she say as to how she would fix him? A. About the husband, she make his will and Henry should receive nothing. Q. Did she repeat those threats down in the sheriff's office? A. Yes, sir." She also said she went down in the car with her husband and Mrs. Perret, and that "Sarah Perret sent my husband to Mr. Dunn," and that she repeated the threats several times in the car. She was asked, " Q. When you arrived at home at Perrets what, if anything, did Sarah Perret say to Michael Perret? A. After myself and my husband came to the house she said to Michael Perret, 'you must make your testament; you must make your testament; and Henry Perret

shall not receive a cent.' That Mr. Dunn was coming and he must make his will, or he would have to go out of the house. Q. Who would have to go out of the house? A. Michael Perret. . . . Q. Did this annoy the old man, or appear to worry him? A. He was worried, and he says, ' God damn it, let me rest.' . . . . Q. How long did they keep this up at the old man, telling him he should make a will like this? A. Until night, until Mr. Dunn and Mr. Hartman came."

Miss Anna Hilke, a sister of Henry Perret's wife, said she was present at the trial in court on February 11, 1896, and was in the hall up stairs. She was asked, " Did you hear Mrs. Sarah Perret make any threats to Henry out in the hall after the trial? A. Yes, sir; she made a threat in the hall and also in the sheriff's office. In the hall she just said she would disinherit him, cut him off without a cent; and when she got down in the sheriff's office she added to it she would fix him for it, and, ' I will fix you to night without a cent. I will cut you off.' She said that in the sheriff's office and she also said it up in the hall. She was very angry, because she lost the suit with Henry about some boards he had taken up for kindling wood, and that is how she happened to say it . . . . Q. Do you remember how she shook her finger? A. She shook her finger nearly every time she said it. She said, ' I will fix you to night.' When she got down stairs she said, ' I will cut you off to night without a cent.' " William Tyler, another witness for defendant, a street commissioner, said he was present in the courthouse on the day of the trial and saw the parties in the sheriff's office. In answer to a question he said, " I noticed her calling Henry a lot of words; she shook her finger at him and said, ' Never mind, Henry, I will cut you off this very night without a cent.' That is all I heard." He also said she was in an angry manner when she said this. Mrs. Jennie Hays, another witness for defendant, said she was present at the trial, and was out in the hall, and down in the sheriff's office with the parties, and heard Mrs. Perret talk to her son. She said, " Sarah Perret came up to her son and she said, ' Never mind, Henry, I will fix you for this; I will have your father cut you off without a cent.' " And, again, when they had paid off the costs in the sheriff's office, she testified that Mrs. Perret " turned around to Henry and says, ' You made me pay all this money out and I will cut

you off tonight without a cent . . . . It is your fault I have this money to pay' . . . . She was very angry . . . . She was very much excited."

There was more testimony of the same kind which it is not necessary to repeat. It is enough to know that on that very night the old woman did precisely what she said she would do. Mr. Dunn and the witnesses came to the house, they went with the old man up stairs ; a will was there written and signed, and it did do exactly what the old woman said it should, cut Henry off without a cent. It was drawn in a rather unusual manner so as to accomplish that object without fail. It provided that if the testator survived his wife, the whole estate would go to his daughter. Although Mrs. Perret vehemently denied using these expressions at all, or any of them, the array of disinterested witnesses who testified to them, giving all the particulars, was altogether too great to leave any reasonable doubt upon that subject, and it is not to be wondered at that the jury refused to believe her, and gave credence to the defendant's witnesses on that subject. Reflecting upon the character of the testimony, as being sufficient to warrant a finding of undue influence, it must be conceded that it was the very kind of evidence to establish that fact. By all the testimony it appeared that the testator was in an extremely enfeebled condition. He was very old, excessively weak, and by numerous witnesses it was testified that he was silly, childish, wandering in his conversation, quite ill physically, so much so that he died in five days after, and the physician who attended him certified that he died of senility. There was also testimony that he was very much afraid of his wife, and had not sufficient will power to resist her importunities. Moreover, in all the declarations she made, she herself proclaimed that she was going to have the will made so as to cut Henry off, and without a cent, and she instinctively and as a matter of course, assumed that she had the mastery over her husband and that he would do whatever she demanded of him to do. And the testimony of Mr. Leibrich and his wife, if believed, brought the wife's intervention and urgency down to the very moment of the execution of the will, so that her power was exerted directly over the testamentary act. It is very seldom indeed that proof of undue influence is brought so very closely and emphatically to the very factum of the will. To

withdraw such testimony as is found in abundance in this case from the jury would have been the gravest error, and could not be thought of for a moment. The evidence that it was not the will the old man wanted to make was quite considerable from ·other sources. It was proved by a number of witnesses that he had frequently expressed himself as well pleased with his son, and his long service for him, and that he repeatedly said to different witnesses that he was going to divide his estate equally between his two children, illustrating his meaning to several of the witnesses by saying that he was going to divide just as he would cut an apple in two halves, giving a half to each child. In every respect we consider that the whole of the testimony conforms fully to the legal requirements of this· class of evidence, and it is not at all surprising that the verdict was in favor of the son. We are entirely satisfied with it, and have no desire to disturb it, being convinced that it was a just and righteous verdict, sustained by ample testimony. The first three assignments of error are dismissed. The proposition contained in the defendant's first point is copied literally from the ruling of this Court in Wilson v. Mitchell, 101 Pa. 495, and, ·was therefore properly affirmed. The fourth assignment is dismissed. The fifth assignment has no merit whatever, and is dismissed. We cannot possibly discover any error in the sixth, seventh, eighth, ninth, tenth and eleventh assignments. They were mere comments by the court upon aspects of the testimony which were not at all in dispute, and the comments were entirely appropriate under the evidence. They ruled nothing, and did not purport to. The whole subject was left to the jury. Of course, the age and physical condition of the testator were proper subjects to be considered by the jury. We think it was not only the right, but the duty, of the court in explaining such a case to the jury to do just as the learned judge below did. The charge was very fair and altogether impartial, and the whole determination of the controversy was left entirely to the jury. There was, as there should have been, a careful and minute definition and explanation of the subject of undue influence, so that the jury might have a full and accurate comprehension of it, and as to the kind and character of evidence necessary to sustain such an accusation. We see nothing erroneous in any of the language of the court on these several matters,

and the assignments are therefore dismissed. As to the twelfth assignment, in relation to the declarations and acts of Sarah Perret as to what she would do, and what she did actually do, in procuring the will to be made as it is, it would be strange indeed if these should be excluded. She was the very person who was charged with having exercised the undue influence, and her declarations were of her own purpose to do that very thing, to have Henry cut off without a cent, by means of a will which she would procure her husband to make. And this was followed up by actual and undisputed proof that that very thing was done, and at the very time she said she would have it done, to wit: the same night. And now we have before us that very will, actually made on that same night, and actually cutting Henry off from every possibility of getting a single penny of the estate, and yet we are asked to exclude evidence of her acts and declarations in producing that result. Most certainly we will do no such thing. The ingenuity displayed in accomplishing her object is something remarkable. If the will had nothing more in it than a gift of the whole estate to the wife, and then she had died before her husband, intestate, Henry would have received one half the estate as heir of his mother. But even that possibility was excluded by the next provision in the will, giving the whole estate to the daughter in case the wife died before her husband. The evil purpose, the positive malignity of the woman, could not be more strongly indicated than by this provision; and that too against her only son, who had contributed by his daily and unrequited toil for twenty-five years to the support and maintenance of both his parents. It is doubtful if so gross a case of unnatural malevolence of a mother to a son can be found in the books. The principles and authorities cited in support of the twelfth assignment have nothing to do with this subject, and they are altogether inapplicable. The assignment is dismissed.

Judgment affirmed.